Patrice L. Bishop (182256)
service@ssbla.com
**STULL, STULL & BRODY**
9430 West Olympic Boulevard
Suite 400
Beverly Hills, CA 90212
Tel: (310) 209-2468
Fax: (310) 209-2087

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| RAND-HEART OF NEW YORK, INC., Individually and on Behalf of All Others Similarly Situated, ) | Case No.: 2:14-CV-5787 |
| Plaintiff, ) | **CLASS ACTION** |
| v. ) | **COMPLAINT** |
| NETSOL TECHNOLOGIES, INC., NAJEEB GHAURI, NAEEM GHAURI, and SALIM GHAURI, ) | **DEMAND FOR JURY TRIAL** |
| Defendants. ) | |

Plaintiff Rand-Heart of New York, Inc. ("Plaintiff"), individually and on behalf of all persons similarly situated, by his undersigned attorneys, for his complaint against Defendants (defined below) alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NetSol Technologies, Inc. ("NetSol" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal class action on behalf of persons (the "Class") who purchased or otherwise acquired the Company's securities between November 12, 2009 and November 8, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## **JURISDICTION AND VENUE**

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule l0(b)-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of

1  materially false and misleading information, occurred in substantial part in this
2  Judicial District.

3      5.    In connection with the acts, conduct and other wrongs alleged in this
4  Complaint, Defendants, directly or indirectly, used the means and instrumentalities
5  of interstate commerce, including but not limited to, the United States mails,
6  interstate telephone communications and the facilities of the national securities
7  exchange.

8                                    **<u>PARTIES</u>**

9      6.    ***Plaintiff Rand-Heart of New York, Inc.*** ("Plaintiff"), as set forth in the
10  attached certification, purchased NetSol securities at artificially inflated prices
11  during the Class Period and has been damaged as a result of the revelations by
12  Defendants of their prior false statements and material omissions.

13     7.    ***Defendant NetSol*** designs, develops, markets, and exports software
14  products primarily to the automobile finance and leasing, banking, healthcare, and
15  financial services industries worldwide. It also provides system integration,
16  consulting, and IT products and services. The Company was founded in 1997 and is
17  headquartered in Calabasas, California.

18     8.    ***Defendant Najeeb Ghauri*** is, and at all relevant times was, the Chief
19  Executive Officer and Chairman of the Company. Najeeb Ghauri has been a
20  Director of the Company since 1997, Chairman since 2003 and Chief Executive
21  Officer since October 2006. Najeeb Ghauri is the founder of NetSol. He was
22  responsible for NetSol listing on NASDAQ in 1999, the NetSol subsidiary listing on
23  KSE (Karachi Stock Exchange) in 2005, and the NetSol listing on the NASDAQ
24  Dubai exchange in 2008. Najeeb Ghauri served as the Company's Chief Executive
25  Officer from 1999 to 2001 and as the Chief Financial Officer from 2001 to 2005. As
26  CEO, Najeeb Ghauri  is responsible for managing the day-to-day operations of the
27  Company, as well as the Company's overall growth and expansion plan.

28

9.     **_Defendant Naeem Ghauri_** is, and at all relevant times was, a Director of the Company and NetSol's President of Global Sales.   Previously, defendant Naeem Ghauri was the Company's CEO from August 2001 to October 2006.   He also serves as the Managing Director of NetSol (UK) Ltd., a wholly owned subsidiary of the Company.

10.    **_Defendant Salim Ghauri_** is, and at all relevant times was, the CEO of NetSol Technologies Limited, a subsidiary of the Company located in Lahore, Pakistan.   Defendant Salim Ghauri was also a Director of the Company at certain times during the Class Period.   According to the Company's Proxy Statement filed on Form DEF 14A (the "2013 Proxy") with the SEC on May 29, 2013, Salim Ghauri "is the founder of NetSol Technologies (previously Network Solutions) and the visionary force behind the Company."   The 2013 Proxy further labeled NetSol Technologies Limited as "the Company's center of technological excellence[.]"

11.    Defendants named above in ¶¶ 8-10 are referred to herein as the "Individual Defendants."

## DEFENDANTS' MATERIALLLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

12.    On November 12, 2009, the Company held a conference call.   During this call, Najeeb Ghauri led the investment community to believe that NetSol had no competition in a captive niche market where customers with old (legacy), non-updatable, computerized systems that were unable to handle the volume and complexity of their needs needed NetSol to design, implement and support a new solution:

> Our customers are looking for proven solution which can be implemented quickly from one vendor with one solution.

1    Further supporting this trend is the again of installed
2    legacy solutions which increasingly cannot handle the
3    volume and complexity of our clients' finance needs.
4    These legacy systems are now virtually impossible to
5    update and must be replaced.
6
7    NetSol can design, implement and support a new solution
8    and once installed, these solutions typically have longer
9    life spans, creating recurring revenues around service and
10   support as well as license upgraded.
11
12   We believe we are in a sweet spot as larger software
13   providers view this a very complex niche market, requiring
14   high levels of investment to build a quality asset based
15   lending solution, but a small company such as NetSol, we
16   see this so called niche market offers a tremendous
17   opportunities for growth worldwide and no competitors.

18       13.    The foregoing representations were materially false and misleading as

19   subsequently disclosed in NetSol SEC filings:

20       (a)    "Older companies have prolonged the life of their legacy

21   products by creating web-based front ends, while the core of the

22   systems has not been re-engineered."  (Form 10-K for the fiscal year

23   ended June 30, 2010); and

24       (b)    "Neither a single company, nor a small number of

25   companies, dominates the IT market in the space in which the Company

26   competes.  A substantial number of companies offer services that

27   overlap and are competitive with those offered by NetSol.  Some of

28   these are large industrial firms, including computer manufacturers and

4

1    computer consulting firms that have greater financial resources than
2    NetSol and, in some cases, may have greater capacity to perform
3    services similar to those provided by NetSol." (Form 10-K for the
4    fiscal year ended June 30, 2010).

5    14.    During 2010, the Company continued to represent that it was building
6    the much needed solution that was intended to replace legacy products:

7        (a)    NetSol improved its Financial Suite (NFS) of products, "in
8    its flexibility, robustness and compatibility to become a leading-edge
9    solution for global markets. The new generation of NFS to be beta
10   tested and rolled out regionally in North American markets." (NetSol
11   Form 10-Q for the quarterly period ended March 31, 2010);

12       (b)    "A number of large leasing companies will be looking to
13   renew legacy applications. This places NetSol in a very strong position
14   to capitalize on any upturn in IT spending by these companies. (Form
15   10-K for the fiscal year ended June 30, 2010); and

16       (c)    NetSol will "continue to . . . [t]est market NFS new
17   generation products with key global customers." (Form 10-Q for the
18   quarterly period ended September 30, 2010).

19   15.    On March 10, 2011, NetSol filed its Amended Form 10-K for its fiscal
20   year ended June 30, 2010 with the SEC. This document, which was signed by
21   Defendants Najeeb Ghauri, Naeem Ghauri, and Salim Ghauri, stated:

22       The Company is well-positioned for continued revenue
23       growth and has invested heavily in the development of its
24       next generation product, which is expected to be
25       completed by the end of calendar year 2011. Globally, our
26       target customers are still using old systems for maintaining
27       their lease and finance portfolios and are now planning to
28       replace their legacy systems. NetSol, being a trusted name

5

1           in this field, is in a good position to tap new business from

2           these companies.  The completion of this next generation

3           software will provide the Company the capability to enter

4           into a much larger market.  We note that this product-

5           conversion may negatively impact our license fee revenue

6           until which point the new product gains traction in the

7           marketplace.

8     16.    These representations were materially false and misleading because:

9         (a)    NetSol's next generation product was not expected to be

10  completed by the end of calendar year 2011;

11        (b)    NetSol's target customers were not planning to replace

12  their legacy systems, and NetSol was not in a good position to tap new

13  business from these companies. The worldwide recession, which

14  adversely impacted financial institutions, caused these financial

15  institutions to forego or otherwise put expenditures on new computer

16  systems on hold; and

17        (c)    There was no reasonable basis for stating that product-

18  conversion may negatively impact Netsol's license fee revenue.

19     17.    On May 10, 2011, NetSol filed its Form 10-Q for the quarter ended

20  March 31, 2011 with the SEC.  This document, which was signed by Najeeb Ghauri,

21  stated in relevant part:

22           Our NFS suite of products is currently undergoing a major

23           initiative towards developing the next generation of

24           solutions.  The Company believes that this would change

25           the landscape for NetSol and increase both demand and the

26           market.

27                        *     *     *

28

> Serious interest in NetSol's next generation solution has been expressed by a few global companies. Demonstrations and workshops with key global clients and partners of have been very well received.  Hence, the new generation solution appears to be gaining momentum.

18.   These representations were materially false and misleading because there was no reasonable basis for stating that development of the next generation of NFS would change the landscape for NetSol and increase both demand and the market.

(a)   Serious interest in NetSol's next generation solution had not been expressed by a few global companies.

(b)   The next generation product did not exist as of May 10, 2011.  Accordingly, there was no reasonable basis for stating that the next generation NFS product had been very well received, or that the new generation solution appeared to be gaining momentum.

19.   On September 16, 2011, Netsol filed its Form 10-K for its fiscal year ended June 30, 2011 with the SEC.  This document, which was signed by Najeeb Ghauri, Naeem Ghauri, and Salim Ghauri, stated in relevant part:

> Growth prospects for NFS are linked to the maturing of the product portfolio and its growing customer base across different geographic and product markets.  With a next generation product ready for testing at customer sites, NetSol is eyeing key international markets for growth in sales . . . .  Growth in North America is expected to come from the huge potential market for replacement of legacy systems.  The next generation version of NFS is aimed at providing a highly flexible solution based on latest technology and advanced architecture for the North

1    American customers looking to replace their legacy

2    systems.

3                        *       *       *

4    Besides the growth in revenues expected through its next

5    generation solution, NetSol expects to continue selling its

6    current version to businesses looking for a mature and

7    globally tested solution.   Future growth will therefore

8    involve increased revenues from both the current version

9    and the next generation of NFS.

10                       *       *       *

11   NetSol is experiencing a growing interest in our next

12   generation NFS solution which is poised to go to market

13   by late 2012 to expand our revenue base.

14                       *       *       *

15   The Company is well-positioned for revenue growth and

16   has invested heavily in the development of its next

17   generation product, which is expected to be completed

18   during the calendar year 2012.   Globally, our target

19   customers are still using old systems for maintaining their

20   lease and finance portfolios and are now planning to

21   replace their legacy systems.  NetSol, being a trusted name

22   in this field, is in a good position to tap new business from

23   these companies.  The completion of this next generation

24   software will provide the Company the capability to enter

25   into a much larger market.  We note that this product-

26   conversion may negatively impact our license fee revenue

27   until which point the new product gains traction in the

28   marketplace.

8

20.     The foregoing statements were materially false and misleading because:

(a)     As of September 16, 2011, Netsol's next generation product (NFS Ascent) did not exist.  Accordingly, NetSol was not experiencing a growing interest in its next generation NFS product, and the product was not ready for testing at customer sites.

(b)     NetSol did not expect future growth through increased revenues from both the current version and the next generation of NFS.

(c)     The worldwide recession, which adversely impacted financial institutions, caused these financial institutions to forego or otherwise put expenditures on new computer systems on hold. Therefore, NetSol did not have a reasonable basis for stating that NetSol expected growth in North America to come from replacement of legacy systems or that its target customers who were still using old systems for maintaining their lease and finance portfolios were planning to replace their legacy systems.

(d)     NetSol's next generation NFS solution was not poised to go to market by late 2012.

(e)     NetSol did not have a reasonable basis for stating that NetSol's next generation product (NFS Ascent) was expected to be completed during the calendar year 2012.

(f)     There was no reasonable basis for stating that product-conversion may negatively impact Netsol's license fee revenue.

21.     On November 8, 2011, NetSol filed its Form 10-Q for the quarter ended September 30, 2011 with the SEC.  This document, which was signed by Najeeb Ghauri, stated in relevant part:

> NetSol is experiencing a growing interest in our next generation NFS solution which is positioned to go to market by late 2012 to expand our revenue base.

*     *     *

> Our NFS suite of products is currently undergoing a major
> initiative towards developing the next generation of
> solutions.  The Company believes that this would change
> the landscape for NetSol and increase both demand and the
> market.

*     *     *

> Serious interest in NetSol's next generation solution has
> been expressed by a few global companies.  Demos and
> workshops with key global clients and partners of have
> been very well received.   Hence, the new generation
> solution appears to be gaining momentum.

22.   These representations were materially false and misleading because:

(a)   The next generation product did not exist as of November 8, 2011.  Accordingly, there was no reasonable basis for stating that there was a growing interest or a serious interest in the product; that the next generation product appeared to be gaining momentum; or that it had been very well received.

(b)   There was no reasonable basis for stating that development of the next generation of NFS would change the landscape for NetSol and increase both demand and the market.

23.   On February 2, 2012, NetSol filed its Form 10-Q for the quarter ended December 31, 2011 with the SEC.  This document, which was signed by Najeeb Ghauri, stated in relevant part:

> Our NFS suite of products is currently undergoing a major
> initiative towards developing the next generation of
> solutions.  The Company believes that this would change
> the landscape for NetSol and increase both demand and the

10

market.   We are in the middle of developing a comprehensive sales and marketing plan requiring new personnel, markets and investment.

\*       \*       \*

Serious interest in NetSol's next generation solution has been expressed by a few global companies.   Demos and workshops with key global clients and partners of have been very well received.   Hence, the new generation solution appears to be gaining momentum.

24.     These representations were materially false and misleading because:

(a)     The next generation product did not exist as of February 2, 2012.  Accordingly, there was no reasonable basis for stating that there was a growing interest or a serious interest in the product; that the next generation product appeared to be gaining momentum; or that it had been very well received.

(b)     There was no reasonable basis for stating that development of the next generation of NFS would change the landscape for NetSol and increase both demand and the market.

25.     On May 7, 2012, NetSol filed its Form 10-Q for the quarter ended March 31, 2012 with the SEC.   At that time it reiterated representations that appeared in Netsol's Form 10-Q for the quarter ended December 31, 2011 as follows:

Our NFS suite of products is currently undergoing a major initiative towards developing the next generation of solutions.   The Company believes that this would change the landscape for NetSol and increase both demand and the market.   We are in the middle of developing a

11

1   comprehensive sales and marketing plan requiring new
2   personnel, markets and investment.

3                              *       *       *

4   Serious interest in NetSol's next generation solution has
5   been expressed by a few global companies. Demos and
6   workshops with key global clients and partners of have
7   been very well received. Hence, the new generation
8   solution appears to be gaining momentum.

9   26.   These representations were materially false and misleading because:

10        (a)    There was no reasonable basis for stating that development
11   of the next generation of NFS would change the landscape for NetSol
12   and increase both demand and the market.

13        (b)    Serious interest in NetSol's next generation solution had
14   not been expressed by a few global companies.

15        (c)    There was no reasonable basis for stating that the next
16   generation NFS product had been very well received, or that the new
17   generation solution appeared to be gaining momentum.

18   27.   On August 13, 2012, NetSol issued a press release which stated:
19        Our NFS suite of products is currently undergoing a major
20        initiative towards developing the next generation of
21        solutions. The Company believes that this would change
22        the landscape for NetSol and increase both demand and the
23        market.    We are in the middle of developing a
24        comprehensive sales and marketing plan requiring new
25        personnel, markets and investment. However, the demand
26        for current NFS has been very robust with some global
27        clients and many new fortune 500 captive finance
28        companies in China, Thailand and Japan.

                                   12

1                                  *      *      *

2          The Company is well-positioned for revenue growth and

3          has invested heavily in the development of its next

4          generation product, which is expected to be completed

5          during the calendar year 2013.   Globally, our target

6          customers are still using old systems for maintaining their

7          lease and finance portfolios and are now planning to

8          replace their legacy systems.  NetSol, being a trusted name

9          in this field, is in a good position to tap new business from

10         these companies.  The completion of this next generation

11         software will provide the Company the capability to enter

12         into a much larger market.  We note that this product-

13         conversion may negatively impact our license fee revenue

14         until which point the new product gains traction in the

15         marketplace.

16         28.    The August 13, 2012 press release was materially false and misleading

17  because:

18              (a)    There was no reasonable basis for stating that development

19  of the next generation of NFS would change the landscape for NetSol

20  and increase both demand and the market.

21              (b)    The worldwide recession, which adversely impacted

22  financial institutions, caused these financial institutions to forego or

23  otherwise put expenditures on new computer systems on hold.

24  Therefore, NetSol did not have a reasonable basis for stating that its

25  target customers who were still using old systems for maintaining their

26  lease and finance portfolios were planning to replace their legacy

27  systems or that Netsol was in a good position to tap new business from

28  these companies.

29.   On September 5, 2012 Netsol filed a Form 10-K for the fiscal year ended June 30, 2012 with the SEC.  This document, which was signed by Najeeb Ghauri and Naeem Ghauri, stated in relevant part:

> Growth prospects for NFS are linked to the maturing of the product portfolio and its growing customer base across different geographic and product markets.  With a next generation solution ready for testing at customer sites, NetSol is eyeing key international markets for growth in sales.  Its sales strategy now carefully balances expansion into new geographic markets including North and South Americas, and further penetration of our already leading position in Asia Pacific.
>
> Growth in North America is expected to come from the huge potential market for replacement of legacy systems.  The next generation version of NFS is aimed at providing a highly flexible solution based on latest technology and advanced architecture for the North American customers looking to replace their legacy systems.
>
> *     *     *
>
> Besides the growth in revenues expected through its next generation solution, NetSol expects to continue selling its current version to businesses looking for a mature and globally tested solution. Future growth will therefore involve increased revenues from both the current version and the next generation of NFS.
>
> *     *     *

14

Our NFS suite of products is currently undergoing a major initiative towards developing the next generation of solutions.  The Company believes that this would change the landscape for NetSol and increase both demand and the market.   We are in the middle of developing a comprehensive sales and marketing plan requiring new personnel, markets and investment.

*        *        *

Serious interest in NetSol's next generation solution has been expressed by a few global companies.  Demos and workshops with key global clients and partners of have been very well received.   Hence, the new generation solution, while not completely ready, is gaining momentum.

*        *        *

The Company is well-positioned for revenue growth and has invested heavily in the development of its next generation product, which is expected to be completed during the calendar year 2013.   Globally, our target customers are still using old systems for maintaining their lease and finance portfolios and are now planning to replace their legacy systems.  NetSol, being a trusted name in this field, is in a good position to tap new business from these companies.  The completion of this next generation software will provide the Company the capability to enter into a much larger market.  We note that this product-conversion may negatively impact our license fee revenue

1   until which point the new product gains traction in the
2   marketplace.

3   30.   Netsol's Form 10-K for the fiscal year ended June 30, 2012 was
4   materially false and misleading because:

5       (a)   The next generation product did not exist as of September
6   5, 2012.  Accordingly, there was no reasonable basis for stating that it
7   was ready for testing at customer sites

8       (b)   The worldwide recession, which adversely impacted
9   financial institutions, caused these financial institutions to forego or
10  otherwise put expenditures on new computer systems on hold.
11  Therefore, NetSol did not have a reasonable basis for stating that
12  growth in North America is expected to come from the huge potential
13  market for replacement of legacy systems.

14      (c)   Netsol's sales of its current version of NFS was waning
15  and the next generation of NFS did not exist and was not proven to be
16  commercially acceptable.   Accordingly, there was no reasonable basis
17  for stating that future growth will involve increased revenues from both
18  the current version and the next generation of NFS.

19      (d)   There was no reasonable basis for stating that development
20  of the next generation of NFS would change the landscape for NetSol
21  and increase both demand and the market.

22      (e)   Serious interest in NetSol's next generation solution had
23  not been expressed by a few global companies.

24      (f)   There was no reasonable basis for stating that the next
25  generation NFS product had been very well received, or that the new
26  generation solution appeared to be gaining momentum.

27      (g)   NetSol did not have a reasonable basis for stating that its
28  target customers who were still using old systems for maintaining their

1    lease and finance portfolios were planning to replace their legacy

2    systems or that Netsol was in a good position to tap new business from

3    these companies.

4        31.    On November 14, 2012, Netsol filed its Form 10-Q for the quarter

5    ended September 30, 2012 with the SEC.  This document, which was signed by

6    Najeeb Ghauri, stated in relevant part:

7            Our NFS suite of products is currently undergoing a major

8            initiative towards developing the next generation of

9            solutions.  The Company believes that this would change

10           the landscape for NetSol and increase both demand and the

11           market.  We are in the middle of developing a

12           comprehensive sales and marketing plan requiring new

13           personnel, markets and investment.

14                                *       *       *

15           Serious interest in NetSol's next generation solution has

16           been expressed by a few global companies.  Demos and

17           workshops with key global client and partners of have

18           been very well received.   Hence, the new generation

19           solution, while not completely ready, is gaining

20           momentum.

21       32.    Netsol's Form 10-Q for the fiscal quarter ended September 30, 2012

22   was materially false and misleading because:

23           (a)    There was no reasonable basis for stating that development

24   of the next generation of NFS would change the landscape for NetSol

25   and increase both demand and the market.

26           (b)    Serious interest in NetSol's next generation solution had

27   not been expressed by a few global companies.

28

                                    17

(c)     There was no reasonable basis for stating that the next generation NFS product had been very well received, or that the new generation solution appeared to be gaining momentum.

33.     On February 12, 2013, Netsol filed its Form 10-Q for the quarter ended December 31, 2012 with the SEC.  This document, which was signed by Najeeb Ghauri, stated in relevant part:  "Serious interest in NetSol's next generation solution has been expressed by a few global companies.  Demos and workshops with key global clients and partners of have been very well received.  Hence, the groundwork for the new generation solution, is gaining momentum."

34.     Netsol's Form 10-Q for the fiscal quarter ended December 31, 2012 was materially false and misleading because:

(a)     The next generation product did not exist as of February 12, 2013.  Accordingly, there was no reasonable basis for stating that it was very well received or that the new generation solution appears to be gaining momentum.

(b)     Serious interest in NetSol's next generation solution had not been expressed by a few global companies.

35.     On May 3, 2013, Salim Ghauri secretly sold 5,000 shares at a price of $12.51 per share for total proceeds of $62,550.00, in violation of securities laws.

36.     On May 9, 2013, Netsol filed its Form 10-Q for the quarter ended March 31, 2013 with the SEC.  This document, which was signed by Najeeb Ghauri, stated in relevant part:  "Serious interest in NetSol's next generation solution has been expressed by a few global companies.  Demos and workshops with key global clients and partners of have been very well received.  Hence, the groundwork for the new generation solution, is gaining momentum."

37.     Netsol's Form 10-Q for the fiscal quarter ended March 31, 2013 was materially false and misleading because:

18

(a)     The next generation product did not exist as of February 12, 2013.  Accordingly, there was no reasonable basis for stating that it was very well received or that the new generation solution appears to be gaining momentum.

(b)     Serious interest in NetSol's next generation solution had not been expressed by a few global companies.

38.     On July 8, 2013, Salim Ghauri secretly sold 917 shares at a price of $10.30 per share for total proceeds of $9,445.10, in violation of securities laws.

39.     On July 9, 2013, Salim Ghauri secretly sold 4,083 shares at a price of $10.30 per share for total proceeds of $42,054.90, in violation of securities laws.

40.     On September 12, 2013, Netsol issued a press release announcing results of operations and financial conditions for the fiscal year ended June 30, 2013. It quoted Najeeb Ghauri as stating: ". . . our average deal size is increasing, new business leads are growing, and add-on projects are expanding . . . .  Today, our new business pipeline and add-on requests from customers are stronger than ever, a fact demonstrated by the signing of more than $20 million in projects in the past two months alone.  We are actively working on a number of similar game-changing deals for the company across the globe."

41.     These statements were materially false and misleading because, at the time they were made, Netsol's:

(a)     Average deal size was not increasing;

(b)     New business leads were not growing;

(c)     Add-on projects were not expanding;

(d)     New business pipeline and add-on requests from customers were not stronger than ever; and

(e)     Global game-changing deals were non-existent.

42.     On September 12, 2013, Netsol held its fiscal 2013 Fourth Quarter and Year-End Results Conference Call.  During this call, Najeeb Ghauri stated "we are

1  reaching a point where demand for current and potential customers is outpacing our

2  ability to service it.  We are no longer providing specific revenue and EPS guidance

3  for the company, even though all signs point to continued growth and strength

4  across the business."

5      43.    These statements were materially false and misleading because, at the

6  time they were made, Defendants new or recklessly failed to know that:

7          (a)    NetSol was not reaching a point where demand for current

8      and potential customers wad not outpacing NetSol's ability to service it.

9          (b)    NetSol was no longer providing specific revenue and EPS

10     guidance for the company because the quarter ended September 30,

11     2013 had resulted in dismal financial results, and the foreseeable future

12     looked bleak.

13         (c)    All internal data pointed to a continued business decline;

14     not "growth and strength across the business."

15     44.    On October 24, 2013, NetSol issued a press release announcing "the

16 introduction and global release of NFS Ascent, the company's next generation

17 platform, offering the most technologically advanced solution for the auto and

18 equipment finance and leasing industry."

19     45.    This press release also quoted Najeeb Ghauri as stating:  "As the rollout

20 of NFS Ascent begins, we are experiencing strong interest from our customers

21 around the globe."

22     46.    These statements were materially false and misleading because, at the

23 time they were made:

24         (a)    There was no global release of NFS Ascent.  Instead, as

25     later disclosed, there was only a soft regional launch with selected

26     customers.

27         (b)    NetSol was not experiencing strong interest from its

28     customers around the globe.

47.   Two weeks later, on November 8, 2013, NetSol issued a press release announcing results of operations and financial conditions for the quarter ended September 30, 2013.   It disclosed materially increased expenses and materially decreased earnings and revenue, and a bleak financial outlook as follows:

(a)   first quarter revenue of $9.1 million, compared with $11.1 million in the same period for the prior fiscal year.

(b)   first quarter license revenue of $2.3 million, compared with $3.2 million in the same period for the prior year.

(c)   first quarter maintenance revenue of $4.4 million, compared with $5.8 million in the same period for the prior year.

(d)   first quarter operating expenses amounted to $4.9 million, compared with $3.8 million in the same period for the prior year.

(e)   Operating loss for the first quarter was $1.5 million, compared with operating income of $1.5 million in the same period for the prior year.

(f)   a slowing of license sales for the first-generation of NFS.

(g)   an expectation that licensee revenue for the first-generation NFS would continue to contract over the next two quarters.

48.   On November 8, 2013, NetSol filed its Form 10-Q for the quarterly period ended September 30, 2013 with the SEC.  This document, which was signed by Najeeb Ghauri, repeated the financial results that were contained within the November 8, 2013 press release.  It also stated in relevant part:

On October 24, NetSol announced the introduction and global release of NFS Ascent, the company's next generation platform, offering the most technologically advanced solution for the auto and equipment finance and leasing industry.   NFS Ascent architecture and user interfaces were designed based on the company's

21

collective experience with global Fortune 500 companies over the past 30 years.  The platform's framework allows auto captive and asset finance companies to rapidly transform legacy dependent information technology into a state-of-the-art IT and business process environment.  At the core of the NFS Ascent platform is a lease accounting and contract processing engine, which allows for an array of interest calculation methods, as well as robust accounting of multi-billion dollar lease portfolios under various types of generally accepted accounting principles (GAAP), as well international financial reporting standards (IFRS).  NFS Ascent, with its distributed and clustered deployment across parallel application and high volume data servers, enables finance companies to process voluminous data in a hyper speed environment.  NFS Ascent has been developed using the latest tools and technologies and its n-tier SOA architecture allows the system to dramatically improve in various areas like scalability, performance, fault tolerance and security to name a few.

*      *      *

A focus of the marketing plan centers around the Global Launch of NFS Ascent, the next generation of NFS that the company has been developing for nearly four years.  Announced on October 24, 2013, NetSol has commenced a soft, regional launch with selected customers in APAC to test the readiness for the global markets.  A formal launch

1    of the global marketing plan is expected for all of our key

2    markets of North America, Europe and APAC.

3    49.    NetSol's Form 10-Q for the quarterly period ended September 30, 2013

4 further stated:

5    Under the supervision and participation of management,

6    including the Chief Executive Officer and Chief Financial

7    Officer, we have performed an assessment of the

8    effectiveness of our internal controls over financial

9    reporting as of September 30, 2013.  This assessment was

10    based on the criteria established in Internal Control-

11    Integrated Framework, issued by the Committee of

12    Sponsoring Organizations of the Treadway Commission.

13    Based on the results of our assessment, the Company has

14    determined that as of September 30, 2013, there was a

15    material weakness in the Company's internal control over

16    financial reporting.  Specifically, while in the performance

17    of this assessment, management identified that its core

18    accounting staff does not have necessary technical

19    accounting training relating to accounting for complex

20    U.S. GAAP matters.   Based on this evaluation,

21    management concluded that our internal control over

22    financial reporting was not effective as of September 30,

23    2013.   Notwithstanding the existence of such material

24    weakness in our internal controls over financial reporting,

25    our management, including our Chief Executive Officer,

26    believes that the financial statements included in this

27    report fairly present in all material respects our financial

28

condition, results of operations and cash flows for the periods presented.

On September 9, 2013, the Company appointed Roger Almond, C.P.A. to act as Chief Financial Officer of NetSol. Management believes that Mr. Almond's appointment as CFO results in the requisite technical accounting knowledge and training relating to accounting for complex U.S. GAAP matters. Management believes that Mr. Almond's appointment will result in the removal of the material weakness in subsequent quarters.

\*       \*       \*

Risk Factors

The Announcement of Our New Generation Product, NFS Ascent, May Result In A Reduction In New License Sales For Our Earlier Generation Product And Accordingly A Drop In Revenues.  On October 24, 2013, the Company announced the introduction and global release of NFS Ascent, the company's next generation platform.  While the Company believes that the new product will be well-received and is positioned to generate more lucrative license and related services revenues, we anticipate that new licenses for the old product will diminish in numbers larger than new product licenses, resulting in a drop in revenues until the new product gains traction in the market.

50.     Upon dissemination of the November 8, 2013 disclosures, NetSol's stock dropped 30% from a closing price of $7.48 on February 7, 2013 to a closing price $5.23 on February 8, 2013 in an inordinate volume of trading.

**Post-Class-Period Disclosures**

51.     On February 14, 2014, NetSol its Form 10-Q for the quarterly period ended December 31, 2013 with the SEC.  It stated in relevant part:

> The company has recently launched its next generation platform "NFS Ascent[TM]," and some of the deals in pipeline for the legacy product have been delayed as the customers are now looking for the next generation. Revenue from the license sales of our legacy product NetSol Financial Suite[TM[',]] as well as services associated with the new sales have been impacted in the current quarter.  Management is expecting sales of the legacy product to remain under pressure for at least two to three quarters until the time that we begin recognizing revenues for NFS Ascent . . . .  A focus of the marketing plan centers around the Global Launch of NFS Ascent, the next generation of NFS that the company has been developing for nearly four years. Announced on October 24, 2013, NetSol has commenced a soft, regional launch with selected customers in APAC to test the readiness for the global markets.  A formal launch of the global marketing plan is expected for all of our key markets of North America, Europe and APAC.
>
> *     *     *
>
> Item 5. Other Information

The U.S. Securities and Exchange Commission notified the Company that it is conducting an investigation and requested the voluntary production of certain documents related to Salim Ghauri, a member of the Company's Board of Directors and an officer of the Company's majority-owned subsidiary NetSol Technologies, Ltd., and the Company's policies covering reporting obligations and disclosure of securities holdings under Section 16 of the Securities Exchange Act of 1934.  The Company promptly engaged outside counsel to conduct an internal investigation of the potential issues and to respond to the SEC. The Company is fully cooperating with the SEC's investigation.   On February 13, 2014, Salim Ghauri authorized the filing of a Form 4 that sets forth certain previously unreported securities transactions by him in the Company's stock during the period of May 10, 2011 to July 12, 2013, which had not been previously disclosed to the Company.  Pursuant to a settlement agreement between the Company and Salim Ghauri dated February 12, 2014, he has paid to the Company the short swing profits recoverable under Section 16(b) of the Act in the amount of $33,197, which includes interest.

In connection with the investigation, we evaluated the filing requirements for all reporting persons.   In that context, we determined that at various points in time prior to May 2013, Najeeb, Naeem and Salim Ghauri should have filed Schedules 13D as their beneficial holdings in the Company stock reached or exceeded 5%.

1                 While Schedules 13D were not filed, the percentages of

2                 their beneficial ownership were disclosed to the investing

3                 public as part of the Company's timely-made Form 10-K

4                 and proxy statement filings. Currently, the beneficial

5                 ownership by each of them is below 5% so no Schedule

6                 l3D filing is currently required.

7       52.     On May 14, 2014, Netsol filed its Form 10-Q for the quarter ended

8 March 31, 2014 with the SEC. It stated in relevant part that:

9                 (a)     License fees for the three months ended March 31, 2014

10 were $2,118,015 compared to $4,790,015 for the three months ended

11 March 31, 2013.

12                 (b)     Services for the three months ended March 31, 2014 were

13 $4,689,019 compared to $5,327,826 for the three months ended March

14 31, 2013.

15                 (c)     The gross profit was $2,381,086 in the quarter ending

16 March 31, 2014 as compared with $6,897,775 for the quarter ended

17 March 31, 2013.

18                 (d)     The cost of sales was $6,981,965 in the current quarter

19 compared to $5,708,840 in quarter ended March 31, 2013.

20                 (e)     Salaries and consultant fees increased by $1,151,958 from

21 $2,954,192 in the prior comparable quarter, to $4,106,150.

22                 (f)     Operating expenses were $5,062,465 for the quarter ending

23 March 31, 2014 as compared to $3,755,735, for the quarter ended

24 March 31, 2013.

25                 (g)     Loss from operations was $2,681,379 compared to income

26 of $3,142,040 for the quarter ended March 2013.

27

28

(h)     Net loss was $1,299,804 for the three months ended March 31, 2014 compared to net income of $1,562,835 for the three months ended March 31, 2013.

(i)     License fees for the nine months ended March 31, 2014 were $4,826,198 compared to $11,537,363 for the nine months ended March 31, 2013.

(j)     Services for the nine months ended March 31, 2014 were $14,208,275 compared to $16,140,819 for the nine months ended March 31, 2013.

(k)     Gross profit was $8,843,834 for the nine ending March 31, 2014 as compared with $19,819,649 for the nine months ended March 31, 2013.

(l)     Cost of sales was $17,994,260 for the nine months ended March 31, 2014 compared to $15,057,826 for the nine months ended March 31, 2013.

(m)     Salaries and consultant fees increased by $2,370,024 from $8,156,677 for the nine months ended March 31, 2013 to $10,526,701 for the nine months ended March 31, 2014.

(n)     Operating expenses were $14,273,382 for the nine months ending March 31, 2014 compared to $11,255,397 for the nine months ended March 31, 2013.

(o)     Loss from operations was $5,429,548 compared to income of $8,564,252 for the nine months ended March 31, 2013.

(p)     Net loss was $4,023,827 for the nine months ended March 31, 2014 compared to net income of $4,714,943 for the nine months ended March 31, 2013.

(q)     Management was expecting licensing revenue to remain depressed through June 30, 2014.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

53.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired NetSol's securities between November 12, 2009 and November 8, 2013, inclusive, seeking to pursue remedies under the Exchange Act.

54.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

55.    Record owners and other members of the Class may be identified from records maintained by NetSol or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts regarding the Company's prospects; and

1    (c)    whether the members of the Class have sustained damages and, if

2    so, the proper measure of damages.

3    59.    A class action is superior to all other available methods for the fair and

4    efficient adjudication of this controversy since joinder of all members is

5    impracticable.  Furthermore, as the damages suffered by individual Class members

6    may be relatively small, the expense and burden of individual litigation make it

7    impossible for members of the Class to individually redress the wrongs done to

8    them.  There will be no difficulty in the management of this action as a class action.

9    **Loss Causation**

10   60.    Defendant's wrongful conduct, as alleged herein, directly and

11   proximately caused the economic loss suffered by Plaintiff and the Class.

12   61.    During the Class Period, as detailed herein, Defendants made materially

13   false and misleading statements and were deliberately reckless such that the market

14   was deceived and by this course of conduct, the price of NetSol securities was

15   artificially inflated and this deliberately reckless course of conduct operated as a

16   fraud or deceit on Class Period purchasers of NetSol securities by misrepresenting

17   the Company's prospects.  Later, when Defendants' prior misrepresentations and

18   material omissions became apparent to the market, the price of NetSol securities fell,

19   as the prior artificial inflation came out of the price.  As a result of their purchases of

20   NetSol securities during the Class Period, Plaintiff and other members of the Class

21   suffered economic loss, *i.e.*, damages, under the federal securities laws.

22   **Applicability of Presumption of Reliance:**

23   **Fraud-on-the-Market Doctrine**

24   62.    At all relevant times, the market for NetSol's securities was an efficient

25   market for the following reasons, among others:

26   (a)    NetSol met the requirements for listing on the NASDAQ, a

27   highly efficient and automated market;

28

(b)    During the Class Period, on average, millions of shares were traded weekly, demonstrating a very active and broad market for NetSol securities and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, NetSol filed periodic public reports with the SEC;

(d)    NetSol regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)    Unexpected material news about NetSol was rapidly reflected and incorporated into the Company's securities price during the Class Period.

63.    As a result of the foregoing, the market for NetSol's securities promptly digested current information regarding NetSol from all publicly available sources and reflected such information in the price of NetSol's securities.  Under these circumstances, all purchasers of NetSol's securities during the Class Period suffered similar injury through their purchase of NetSol's securities at artificially inflated prices, and a presumption of reliance applies.

## FIRST CLAIM

### Violation of Section 10(b) Of

### The Exchange Act and Rule 10(b)-5

### Promulgated Thereunder Against All Defendants

64.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.    This claim is brought against NetSol and all of the Individual Defendants.

66.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) caused Plaintiff and other members of the Class to purchase NetSol's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and/or reckless course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NetSol's securities in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

68.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and/or a reckless course of conduct as alleged herein in an effort to assure investors of NetSol's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NetSol and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and/or a reckless course of business that operated as a fraud and deceit upon the purchasers of NetSol's securities during the Class Period.

69.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (a) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial prospects; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances and operations at all relevant times; and (d) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain, verify and to disclose such facts, even though such facts were available to them.

71.   As a result of the dissemination of the materially false and misleading information and failure to verify and disclose material facts, as set forth above, the market price of NetSol's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of NetSol's securities were artificially inflated, and relying directly or indirectly on the misleading statements and Company press releases issued by Defendants, or upon the integrity of the market in which the Company's securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and

1  the other members of the Class acquired NetSol securities during the Class Period at
2  artificially high prices and were or will be damaged thereby.

3       72.    At the time of said omissions and/or materially false and misleading
4  statements, Plaintiff and other members of the Class were ignorant of their
5  misleading nature, and believed them to be true.

6       73.    By virtue of the foregoing, Defendants have violated Section 10(b) of
7  the Exchange Act, and Rule 10b-5 promulgated thereunder.

8       74.    As a direct and proximate result of Defendants' wrongful conduct,
9  Plaintiff and the other members of the Class suffered damages in connection with
10  their respective purchases and sales of the Company's securities during the Class
11  Period.

12  <center>**SECOND CLAIM**</center>

13  <center>**Violation of Section 20(a) Of**</center>

14  <center>**The Exchange Act Against The Individual Defendants'**</center>

15       75.    Plaintiff repeats and re-alleges each and every allegation contained
16  above as if fully set forth herein.

17       76.    The Individual Defendants acted as controlling persons of NetSol
18  within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By
19  virtue of their high-level positions, agency, and their ownership and contractual
20  rights, participation in and/or awareness of the Company's operations and/or
21  intimate knowledge of the misleading financial information filed by the Company
22  with the SEC and disseminated to the investing public, the Individual Defendants
23  had the power to influence and control, and did influence and control, directly or
24  indirectly, the decision-making of the Company, including the content and
25  dissemination of the various statements that Plaintiff contends are false and
26  misleading.

27       77.    The Individual Defendants had direct and supervisory involvement in
28  the day-to-day operations of the Company and, therefore, are presumed to have had

<center>34</center>

the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

79.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper.

///
///
///

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Patrice L. Bishop
**STULL, STULL & BRODY**

Dated: July 25, 2014          By:     */s/Patrice L. Bishop*
                                       Patrice L. Bishop
                                       9430 West Olympic Boulevard
                                       Suite 400
                                       Beverly Hills, CA  90212
                                       Tel:   (310) 209-2468
                                       Fax:   (310) 209-2087
                                       service@ssbla.com

                                       *Liaison Counsel for Plaintiff*

                                       Thomas J. McKenna
                                       tjmckenna@gme-law.com
                                       **GAINEY McKENNA & EGLESTON**
                                       440 Park Avenue South, 5th Floor
                                       New York, NY 10016
                                       Tel:   (212) 983-1300
                                       Fax:   (212) 983-0383

                                       *Counsel for Plaintiff*

36

## CERTIFICATION OF NAMED PLAINTIFF

I, *Nano Hans* ("Plaintiff") hereby retain the firm and such co-counsel it deems appropriate to associate with, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *NetSol Technologies, Inc.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---------------|--------------|----------|------|-----------------|
| See Attached  |              |          |      |                 |
|               |              |          |      |                 |
|               |              |          |      |                 |
|               |              |          |      |                 |
|               |              |          |      |                 |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of ____, 2014

_____
Signature

*Nano Hans*
Print Name (& Title if applicable)

## TRADES IN NTWK

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 152 | NTWK | Buy | 12/28/2010 | $19.30 |
| 700 | NTWK | Buy | 12/28/2010 | $19.30 |
| 800 | NTWK | Buy | 12/28/2010 | $19.30 |
| 300 | NTWK | Buy | 12/28/2010 | $19.32 |
| 200 | NTWK | Buy | 12/28/2010 | $19.32 |
| 300 | NTWK | Buy | 12/28/2010 | $19.30 |
| 700 | NTWK | Buy | 12/28/2010 | $19.30 |
| 400 | NTWK | Buy | 12/28/2010 | $19.30 |
| 200 | NTWK | Buy | 12/28/2010 | $19.20 |
| 400 | NTWK | Buy | 12/28/2010 | $19.20 |
| 100 | NTWK | Buy | 12/28/2010 | $19.20 |
| 300 | NTWK | Buy | 12/28/2010 | $19.20 |
| 220 | NTWK | Buy | 12/28/2010 | $19.20 |
| 332 | NTWK | Buy | 12/28/2010 | $19.20 |
| 148 | NTWK | Buy | 12/28/2010 | $19.30 |
| 258 | NTWK | Buy | 12/29/2010 | $19.30 |
| 60 | NTWK | Buy | 12/29/2010 | $19.30 |
| 742 | NTWK | Buy | 12/29/2010 | $19.30 |
| 1000 | NTWK | Buy | 12/29/2010 | $19.30 |
| 10 | NTWK | Buy | 12/29/2010 | $19.30 |
| 288 | NTWK | Buy | 12/29/2010 | $19.50 |
| 350 | NTWK | Buy | 12/29/2010 | $19.50 |
| 702 | NTWK | Buy | 12/29/2010 | $19.50 |
| 500 | NTWK | Buy | 12/29/2010 | $19.47 |
| 500 | NTWK | Buy | 12/29/2010 | $19.59 |
| 338 | NTWK | Buy | 12/29/2010 | $19.95 |
| 1,070 | NTWK | Buy | 10/12/2011 | $6.40 |
| 1,030 | NTWK | Buy | 10/17/2011 | $6.71 |
| 4,740 | NTWK | Buy | 10/17/2011 | $6.71 |
| 2,600 | NTWK | Buy | 10/18/2011 | $6.70 |
| 560 | NTWK | Buy | 10/18/2011 | $6.70 |
| 152 | NTWK | Sell | 11/08/2013 | $5.27 |
| 700 | NTWK | Sell | 11/08/2013 | $5.27 |
| 800 | NTWK | Sell | 11/08/2013 | $5.27 |
| 300 | NTWK | Sell | 11/08/2013 | $5.27 |
| 200 | NTWK | Sell | 11/08/2013 | $5.27 |
| 300 | NTWK | Sell | 11/08/2013 | $5.27 |
| 48 | NTWK | Sell | 11/08/2013 | $5.27 |
| 652 | NTWK | Sell | 11/08/2013 | $5.27 |
| 400 | NTWK | Sell | 11/08/2013 | $5.27 |
| 200 | NTWK | Sell | 11/08/2013 | $5.27 |
| 400 | NTWK | Sell | 11/08/2013 | $5.27 |

| 100 | NTWK | Sell | 11/08/2013 | $5.27 |
|------|------|------|------------|-------|
| 300 | NTWK | Sell | 11/08/2013 | $5.27 |
| 220 | NTWK | Sell | 11/08/2013 | $5.27 |
| 228 | NTWK | Sell | 11/08/2013 | $5.27 |
| 104 | NTWK | Sell | 11/11/2013 | $5.29 |
| 148 | NTWK | Sell | 11/11/2013 | $5.29 |
| 258 | NTWK | Sell | 11/11/2013 | $5.29 |
| 60 | NTWK | Sell | 11/11/2013 | $5.29 |
| 742 | NTWK | Sell | 11/11/2013 | $5.29 |
| 1000 | NTWK | Sell | 11/11/2013 | $5.29 |
| 10 | NTWK | Sell | 11/11/2013 | $5.29 |
| 288 | NTWK | Sell | 11/11/2013 | $5.29 |
| 350 | NTWK | Sell | 11/11/2013 | $5.29 |
| 702 | NTWK | Sell | 11/11/2013 | $5.29 |
| 500 | NTWK | Sell | 11/11/2013 | $5.29 |
| 500 | NTWK | Sell | 11/11/2013 | $5.29 |
| 338 | NTWK | Sell | 11/11/2013 | $5.29 |
| 1070 | NTWK | Sell | 11/11/2013 | $5.38 |
| 1030 | NTWK | Sell | 11/11/2013 | $5.38 |
| 4740 | NTWK | Sell | 11/11/2013 | $5.38 |
| 2600 | NTWK | Sell | 11/11/2013 | $5.38 |
| 560 | NTWK | Sell | 11/11/2013 | $5.38 |