1  Patrice L. Bishop (182256)
   service@ssbla.com
2  **STULL, STULL & BRODY**
   9430 West Olympic Boulevard
3  Suite 400
   Beverly Hills, CA  90212
4  Tel:   (310) 209-2468
   Fax:   (310) 209-2087
5
6  *Liaison Counsel for Lead Plaintiff and the Putative Class*

7  Thomas J. McKenna (admitted *Pro Hac Vice*)
   tjmckenna@gme-law.com
8  **GAINEY McKENNA & EGLESTON**
   440 Park Avenue South, 5th Floor
9  New York, NY 10016
   Tel:   (212) 983-1300
10 Fax:   (212) 983-0383

11 *Lead Counsel for Lead Plaintiff and the Putative Class*

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                   **WESTERN DIVISION**

16

17 RAND-HEART OF NEW YORK,)  Case No. 2:14-cv-5787 PA (SHx)
   Individually and on Behalf of All)
18 Others Similarly Situated,        )  **PLAINTIFFS' MEMORANDUM OF**
                                     )  **POINTS AND AUTHORITIES IN**
19                  Plaintiffs,      )  **OPPOSITION TO DEFENDANTS'**
                                     )  **MOTION TO DISMISS THE FIRST**
20        v.                         )  **AMENDED CONSOLIDATED**
                                     )  **COMPLAINT**
21 NETSOL   TECHNOLOGIES,   INC.,)
   NAJEEB   GHAURI,   and   NAEEM)   Date:      June 8, 2015
22 GHAURI,                          )  Time:      1:30 p.m.
                                     )  Dept.:     15
23              Defendants.          )  Judge:     Hon. Percy Anderson
                                     )
24 _____ )

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY OF THE COMPLAINT ................................................... 3

III.  STANDARD OF REVIEW .................................................................. 5

IV.   ARGUMENT ....................................................................................... 6

      A.   The FAC Satisfies The Requirements Of Rule 9(b) And The Reform
           Act And Does Not Plead Fraud By Hindsight ........................................ 6

      B.   Defendants' Statements Are Actionable Statements ............................. 6

           1.   The "Multiple Client Wins" .......................................... 8

           2.   The Demand for the NFS NextGen ............................................ 11

           3.   The Company's Purported "Global Launch" for       the       NFS
                NextGen ................................................................... 12

           4.   Defendants Purported "Release" to the Global ......................... 14
                "Auto and Equipment Finance and Leasing Industry" .............. 14

      C.   The Facts Collectively Raise a Strong Inference of Scienter ............... 15

           1.   Defendants Were Deliberately Reckless in Failing to Obtain
                And Disclose Facts That Were Readily Available .................... 15

           2.   The Core Operations Inference Supports a   Strong   Inference   of
                Scienter ................................................................ 17

                a.   Individual Defendants Had Actual Access to the
                     Information Regarding the Sales of NextGen ....... 18

      D.   Defendants' Alleged Stock Positions And/Or Purchases Do Not Negate
           Scienter ..................................................................... 23

      E.   Defendants' Statements Are Not Forward Looking ............................ 23

      F.   Plaintiffs Allege Control Person Claims Under Section 20(a) ............. 24

V.    CONCLUSION ................................................................................... 25

**Plaintiffs' MPA in Opposition to Defendants' Motion to
Dismiss the First Amended Consolidated Complaint**

# **TABLE OF AUTHORITIES**

**C**ASES

*Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.*,
   756 F. Supp. 2d 1113 (D. Arizona 2010) ........................................................ 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................... 5

*Basic Inc. v. Levinson*,
   485 U.S. 224, 240 (1988) .............................................................................. 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................... 5

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ......................................................... 7, 12, 16, 22

*Curry v. Hansen Medical, Inc.*,
   2012 WL 3242447 (N.D. Cal. 2012) ................................................................ 22

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...................................................................................... 6

*Epstein v. Itron, Inc.*,
   993 F. Supp. 1314 (E.D. Wash. 1998) ....................................................... 20, 21

*Harris v. Amgen, Inc.*,
   573 F.3d 728 (9th Cir. 2009) .......................................................................... 27

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ........................................................................ 16

*In re Allaire Corp. Sec. Litig.*,
   224 F. Supp. 2d 319 (D. Mass. 2002) .............................................................. 9

*In re Computer Assocs. Sec. Litig.*,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) ................................................................. 12

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................................... 5, 24

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

*In re DDi Corp. Sec. Litig.*,

    No. 03-7063, 2005 WL 3090882 (C.D. Cal. July 21, 2005)............................ 8

*In re Gilead Scis. Sec. Litig.*,

    536 F.3d 1049 (9th Cir. 2008).................................................................... 12

*In re HI/FN, Inc. Sec. Litig.*,

    No. C–99–4531 SI, 2000 WL 33775286 (N.D. Cal. Aug. 9, 2000) ................ 8

*In re Metawave Communs. Corp. Sec. Litig.*,

    298 F. Supp. 2d 1056 (W.D. Wash. 2003)..................................................... 8

*In re Oracle Corp. Sec. Litig.*,

    627 F.3d 376 (9th Cir. 2010)...................................................................... 16

*In re Peoplesoft, Inc., Sec. Litig.*,

    2000 WL 1737936 (N.D. Cal. 2000)........................................................... 20

*In re Vivendi Universal, S.A. Sec. Litig.*,

    381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................... 9

*Kaplan v. Rose*,

    49 F.3d 1363 (9th Cir. 1994)........................................................................ 6

*Lisker v. City of Los Angeles*,

    2012 WL 3588560 (C.D. Cal. Aug. 20, 2012).................................................. 3

*Maiman v. Talbott*,

    2010 U.S. Dist. LEXIS 142712 (C.D. Cal. Aug. 9, 2010)............................. 25

*Matrixx Initiatives, Inc. v. Siracusano*,

    563 U.S.__, 131 S. Ct. 1309, 1318 (2011) .................................................. 6, 7

*N.M. State Inv. Council v. Ernst & Young LLP*,

    641 F.3d 1089 (9th Cir. 2011)..................................................................... 16

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*

    *Am. W. Holding Corp.*,

    320 F.3d 920 (9th Cir. 2003)................................................................... 8, 25

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)............................................................. 9

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

    380 F.3d 1226 (9th Cir. 2004) ................................................................. 19, 24

*Patel v. Axesstel, Inc.*,

    2015 WL 631525 (S.D. Cal. 2015) ......................................................... 21, 22

*Reese v. Malone*,

    747 F.3d 557 (9th Cir. 2014) ......................................................................... 19

*S. Ferry LP No. 2 v. Killinger*,

    399 F. Supp. 2d 1121 (W.D. Wash. 2005) ..................................................... 7

*S. Ferry LP, No. 2 v. Killinger*,

    542 F.3d 776, 782 (9th Cir. 2008) ....................................... 5, 7, 16, 19

*Shapiro v. UJB Fin. Corp.*,

    964 F.2d 272 (3d Cir. 1992) ............................................................................ 9

*State Bd. of Admin. v. Green Tree Fin. Corp.*,

    270 F.3d 645 (8th Cir. 2001) ....................................................................... 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

    551 U.S. 308 (2007) ............................................................................. 16, 17

*TSC Indus. v. Northway, Inc.*,

    426 U.S. 438 (1976) ......................................................................................... 7

*U.S. v. Miah*,

    593 Fed. Appx. 741 (9th Cir. 2015) ............................................................. 3

*Va. Bankshares v. Sandberg*,

    501 U.S. 1083  (1991) .................................................................................. 12

*Westley v. Oclaro*, Inc.,

    897 F. Supp. 2d 902 (N.D. Cal. 2012) ........................................................ 12

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,

    655 F.3d 1039 (9th Cir. 2011) .................................................................... 17

*Zucco Partners, LLC v. Digimarc Corp.*, 5

    52 F.3d 981 (9th Cir. 2009) ......................................................................... 26

iv      **Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

1  <u>STATUTES</u>

2  15 U.S.C. § 78u-4 ................................................................................................ 6

3  <u>RULES</u>

4  Fed. R. Civ. P. 9(b) ......................................................................................... 5, 6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

## I.     INTRODUCTION

Lead Plaintiff Rand-Heart of New York and Plaintiff Mike Clementi ("Plaintiffs") submit their memorandum of law in opposition to Defendants' Motion to Dismiss First Amended Consolidated Class Action Complaint (Dkt. No. 59).  As set forth herein, Plaintiffs' First Amended Consolidated Complaint ("FAC") (Dkt. No. 56) adequately states claims against Defendants[1] on behalf of investors that purchased NetSol securities between May 10, 2011, and November 8, 2013 (the "Class Period"), for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants' motion should be denied in its entirety.

NetSol has one major product: the NFS™ (NetSol Financial Suite) of software which the Company sells to leasing companies to help them manage their contracts and the flow of payments.  NetSol's existing product (the "Legacy" NFS) is old and has been on the market for years.  Defendants, Najeeb and his brother Naeem, were controlling shareholders and ran NetSol with the third brother, Salim Ghauri.  Najeeb is the Chief Executive Officer ("CEO") and Chairman of NetSol.  Naeem is a Director of NetSol and the President of Global Sales.  Prior to and during the Class Period, NetSol was trying to create and sell a more modern replacement NFS software product, which they dubbed NFS Ascent™ ("NFS NexGen" or "NFS Ascent").

The software is a major purchase for any customer of NetSol because, if purchased, all of the customer's existing contract and cash flow data has to be "migrated" from its existing software system over to the new NFS NexGen software.  Defendants' claim the process takes 18 months to install the NFS NexGen software and is a massive undertaking.

---

[1] Defendants are NetSol Technologies, Inc. ("NetSol" or the "Company"), Najeeb Ghauri ("Najeeb") and Naeem Ghauri ("Naeem").

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

Before and during the Class Period, Defendants began a non-stop drumbeat of statements designed to falsely tout the NFS NextGen.  As will be shown, NetSol is a small company with most of its employees writing software code in Pakistan and India and very few managers.  The two individual defendants are the founders of the Company, controlling shareholders and, by their own admissions, intimately involved in the day-to-day operations and sales efforts of NetSol.

Defendants made four (4) false statements designed to mislead the market. When the four statements are viewed together, holistically, it is apparent that they are false and that Defendants made the statements with scienter. The four statements are (1) Defendants' claim on May 10, 2011, that they had recently "secured multiple client wins for NFS NextGen" (¶ 27); (2) Defendants' claim on September 5, 2012, that "NetSol continues to enjoy demand for the current NFS solution, as well as the next generation" (¶ 30) and repeated again on September 12, 2012 (¶ 32); (3) Defendants' press release on October 24, 2013, announcing the "rollout of NFS [NexGen]" and the "introduction and *global release* of NFS [NexGen], the company's next generation platform . . ." (¶ 35) (emphasis added); and (4) Defendants' press release on October 25, 2013, announcing the "release" of the NFS NexGen to the "Auto and Equipment Asset and Financing and Leasing Industry." (¶ 37).  Each of these statements was designed to mislead the investing public into believing that the NextGen product was being sold globally and that the Company had signed contracts and/or agreements with customers for the NFS NexGen.

On November 8, 2013, when NetSol filed its Form 10-Q, Defendants admitted that as to the NFS NextGen software product, they had only "commenced a *soft, regional launch* with selected customers in APAC [Asian-Pacific market] to test the readiness for the global markets." (¶ 39).  Defendants also admitted on November 8, 2013, that they did not expect any revenue from NFS NextGen for at least two to three quarters.  When the market finally realized that there were no sales of the NFS NextGen product but only "testing the readiness" and no revenue expected from

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

1  NFS NexGen, investors fled and the stock dropped 30% in one day. The stock
2  dropped so violently because the investing public finally realized that it was all tout
3  and no substance – they had been lied to. Later, on May 13, 2014, Najeeb was
4  forced to admit that as of that date NetSol still did not have any signed contracts
5  with any customer to buy the NFS NextGen product. *See* Q3 2014 NetSol
6  Technologies, Inc. Earnings Conference Call, dated May 13, 2014 (Najeeb: ". . . *we*
7  *have not made any signed agreements yet* [for the NFS NexGen].") (Ex. A at 6 to
8  the Declaration of Thomas J. McKenna in Opposition to Defendants' Motion to
9  Dismiss ("McKenna Decl.")).[2]

10  **II.     SUMMARY OF THE COMPLAINT**

11       NetSol claims it designs, develops, markets, and exports software products
12  primarily to the automobile finance and leasing, banking, healthcare, and financial
13  services industries worldwide. (¶16).[3] NetSol says its "primary source of revenue is
14  the licensing, customization, enhancement and maintenance of its suite of financial
15  applications under the brand name NFS™ (NetSol Financial Suite) and NFS
16  Ascent™ [NFS NexGen] for leading businesses in the global lease and finance
17  industry." (¶ 3).

18       The NFS NexGen software replacing the Legacy software is the main product
19  that NetSol sells. Clearly, the founding brothers of the Company (¶¶ 17, 18),
20  controlling shareholders (¶ 21) and persons who claim to have day-to-day
21  responsibility (¶¶ 17, 53, 54, 55, 70), would be aware of the status of whether they

22  _____

23  [2] Under Rule 804(b)(3) of the Federal Rules of Civil Procedure, the statements made
24  by Najeeb and Naeem in the conference calls attached to the McKenna Declaration
    fall within the statements against interest exception. *Lisker v. City of Los Angeles*,
25  2012 WL 3588560, at *3 (C.D. Cal. Aug. 20, 2012); *U.S. v. Miah*, 593 Fed. Appx.
26  741 (9th Cir. 2015).

27  [3] As of June 30, 2013, the Company had only 1,110 full-time employees of which
28  832 were IT project and technical personnel. In the entire Company there were only
    34 employees in management. *See* NetSol's Form 10-K, dated Sept. 12, 2013 at 11.

had any sales of the NFS NexGen product and whether they were prepared to release the product globally or just as a "soft regional launch" in the Asia-Pacific region.  In addition, the Company conference calls demonstrate that both Najeeb and Naeem were intimately knowledgeable regarding the sale status and contract documentation status ("client wins") of every single ongoing potential sale that NetSol had.  *See* Ex. B (Najeeb reviewing business activities (*i.e.*, sales, contracts, agreements) in the Company's three global regions: (1) North America, (2) Europe, and (3) Asia-Pacific (Q1 2012 NetSol Technologies, Inc. Earnings Conference Call, dated Nov. 8, 2011 at 2-3) and summarizing the Company's roadmap. (*Id.* at 6-7); Ex. C (Q2 2012 NetSol Technologies, Inc. Earnings Conference Call, dated Feb. 2, 2012 at 2-3, 4-5) (same); Ex. D (Q3 2012 NetSol Technologies, Inc. Earnings Conference Call, dated May 7, 2012 at 2-3) (same); Ex. G (Q4 2012 NetSol Technologies, Inc. Earnings Conference Call, dated Sept. 4, 2012 at 2-3, 4-6) (same); Ex. H (Q1 2013 NetSol Technologies, Inc. Earnings Conference Call, dated  Nov. 14, 2012 at 2-3, 6, 9); Ex. I (Q3 2013 NetSol Technologies, Inc. Earnings Conference Call, dated May 9, 2013 at 2-3, 5-6[4], 9[5]); and Ex. J (Q4 2013 NetSol Technologies, Inc. Earnings Conference Call, dated Sept. 12, 2013 at 2-3, 14).  Moreover, this NFS software solution that NetSol sells is a major purchase for any customer, takes eighteen (18) months to install, and is not like plucking a cell phone off the shelf at Best Buy.  Therefore, it is more probable than not that Najeeb as CEO and Naeem as Director of Global

---

[4] "Greg P. Garner: Okay. And can you give me a sense for the overall view on the NFS pipeline or inquiry level or the interest level in the U.S., and also perhaps in Asia, just to get a sense for how that maybe -- is it ebbing and flowing a little bit or is it improving or are certain areas better or worse than others?  Can you give us any color on that?  Najeeb Ullah Ghauri: Yes. Sure. I'll have Naeem Ghauri, who is the Head of the Sales, **he'll have everything on his fingertip**. Naeem, you want to answer that, please?"  (Emphasis added.)

[5] "Naeem Ullah Ghauri: On the NFS side . . . it's very clear that for us the core business remains NFS."

1  Sales were intimately aware of every single contract and client negotiation that was

2  ongoing.

3      Further, as shown by the Q1 2012 NetSol Technologies, Inc. Earnings

4  Conference Call, November 8, 2011, at Ex. B at 4 to the McKenna Decl., CEO

5  Najeeb, besides being intimately involved in the day-to-day operations of the

6  Company (¶¶ 17, 53, 54, 55, 70), correctly noted for analysts that the NFS NexGen

7  was the "bread and butter" of the Company.  Last, there are only four executive

8  positions in NetSol (CEO, CFO, Senior VP, and Chief Accounting Officer), and two

9  of those executive positions were held by Najeeb and Naeem.  Thus, the more

10  reasonable inference is that these two high level executives, who managed the day-

11  to-day operations of this relatively small, family-created company, were aware of

12  the alleged misrepresentations regarding their "bread-and-butter" product.

13  **III.   STANDARD OF REVIEW**

14      <u>**Applicable Standards for a Motion to Dismiss Do Not Favor Defendants**</u>

15      To state a claim, a request for relief need only be "plausible," *Bell Atl. Corp.*

16  *v. Twombly*, 550 U.S. 544, 570 (2007), *i.e.*, "plead[] factual content that allows the

17  court to draw the reasonable inference that the defendant is liable for the misconduct

18  alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In assessing the sufficiency

19  of the FAC, the Court must "accept the plaintiffs' allegations as true and construe

20  them in the light most favorable to plaintiffs." *In re Daou Sys., Inc.*, 411 F.3d 1006,

21  1013 (9th Cir. 2005) (citation omitted); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d

22  776, 782 (9th Cir. 2008).

23      To state a claim under § 10(b) of the Exchange Act, Plaintiffs must allege: (1)

24  a material misrepresentation or omission; (2) scienter; (3) a connection with the

25  purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.

26  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Additional

27  requirements are imposed as to the first two elements.  Under Rule 9(b) and the

28  Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs also must plead

falsity with particularity, "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).

## IV.   ARGUMENT

### A.   The FAC Satisfies The Requirements Of Rule 9(b) And The Reform Act And Does Not Plead Fraud By Hindsight

Under Rule 9(b), a complaint alleging fraud must "state precisely the time, place, and nature of the misleading statements, misrepresentations, or specific acts of fraud." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994).

### B.   Defendants' Statements Are Actionable Statements

When discussing statements made, as opposed to material information withheld, "[t]o prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011)  (emphasis in original).  A "statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  As to an omission, the materiality requirement is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Importantly, the Supreme Court has repeatedly rejected attempts to "'artificially exclud[e]' [information that] 'would otherwise be considered significant to the trading decision of a reasonable investor.'"  *Matrixx*, 131 S. Ct. at 1318.

Here, the FAC alleges with particularity that Defendants made material false and misleading statements with deliberate recklessness regarding the Company's next generation software product (NFS NexGen) in violation of the Exchange Act

(15 U.S.C. § 78u-4(b)(1)).   When the facts became known to the market on November 8, 2013, the price of NetSol stock dropped 30%.  (¶ 41).

Further, "[g]enerally speaking, 'projections and general statements of optimism may trigger liability under federal securities laws'. . . .  [S]tatements on the extreme edge of generality and vagueness may be insufficient as a basis for a securities fraud claim.  However . . . the exception for puffery is narrowly drawn." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005), *vacated on other grounds*, 542 F.3d 776.[6]  Defendants' statements here are not on the "extreme edge of generality and vagueness" warranting possible dismissal. Moreover, at the pleading stage, if the Court has determined that some misstatements and omissions are actionable, the Court "need not parse through each and every alleged misstatement contained in the complaint to determine if it is actionable." *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *13 (C.D. Cal. July 21, 2005) (citations omitted).

Statements similar to Defendants' have been held to be actionable where, as here, the optimistic statements failed to disclose material concerns.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp*., 320 F.3d 920, 927, 935 (9th Cir. 2003) ("bright revenue prospects" were ahead was actionable where defendants failed to disclose or misrepresented maintenance issues, FAA investigation and meaning of settlement agreement); *In re Metawave Communs. Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003)

---

[6] Materiality issues involve a "fact-specific inquiry" that should almost always be determined by a jury.  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).   A statement is material if there is a "substantial likelihood" that a "reasonable investor" would view it as significantly altering "the total mix of information available."  *Id.* at 231-32.   Dismissal is warranted only if the false statements or omissions are so clearly unimportant that reasonable minds could not differ in holding them immaterial.  *Id.*

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

1  (representation that there was demand when product was not functional could be

2  relied upon by a reasonable investor); *In re HI/FN, Inc. Sec. Litig.*, 2000 WL

3  33775286, at *5-6 (N.D. Cal. Aug. 9, 2000) (expressions of optimism and forecasts

4  of increased business and revenues were actionable and not mere puffery, where

5  defendants allegedly knew of imminent reduction in orders).[7]

6  ### 1.   The "Multiple Client Wins"

7  Defendants argue that (1) the "implementation" of the NFS NexGen at a bank

8  in Thailand was a "sale" (MTD at 11:21-22)[8]; (2) the GMAC "installation" of the

9  NFS NexGen in China was another "win" (MTD at 11:17); and (3) Plaintiffs do not

10  provide any contemporaneous evidence that the Thailand bank installation was the

11  only NFS NexGen "win" for the Company.  MTD at 11:22-24.

12  Webster's New Collegiate Dictionary defines "win" as (1) to gain victory in a

13  contest; (2) to succeed in arriving at a place or state; (3) to get possession of by

14  effort or fortune; (4) to obtain by work – ***earn***.  Defendants historically used the

15  word "win" when informing the market of a signed agreement or contract.  For

16  example, in the 3Q 2012 NetSol Technologies, Inc. Earnings Conference Call, dated

17  May 7, 2012, Najeeb and Naeem described a "win" as follows:

18  **<u>NAJEEB</u>**: Let me now briefly touch upon our joint venture efforts.

19  AtheebNetSol in Saudi Arabia recently ***signed multiple agreements***

20

21  [7] *See also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("inventory situation

22  was 'in good shape' or 'under control'"); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272,

23  283 (3d Cir. 1992) (reserves were "adequate," "adequately maintained," "strong"

24  and "solid"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 180

25  (S.D.N.Y. 2003) (claim that company was in a "very strong position, with solid

26  performance in virtually every business" was material); *In re Allaire Corp. Sec.

27  Litig.*, 224 F. Supp. 2d 319, 331-32 (D. Mass. 2002) (product was "fueling growth").

26  [8] Counsel's statement that NFS NexGen at a bank in Thailand was a "sale" cannot be

27  true as Najeeb admitted on a May 13, 2014 conference call that "we have not made

28  any signed agreements yet [for the NFS NexGen]."  *See* Attached as Ex. A at 6 to

the McKenna Decl.

**Plaintiffs' MPA in Opposition to Defendants' Motion to
Dismiss the First Amended Consolidated Complaint**

with a combined value of $2 million plus in the areas of cybersecurity, application development and consulting. And we are actively bidding on additional big-sized projects in Saudi Arabia. ***The multiple wins*** demonstrate our ability to implement a diverse set of customized solutions for our customers and underscore our ability to generate revenue for products outside our core suite of services.

* * *

**NAEEM**: You know, the way it works is that you might have seen quite a few ***contract wins*** recently. So that happens when you actually build a healthy pipeline.

Ex. D at 2-3, 7 to the McKenna Decl.[9]

Nowhere in Defendants' Form 10-Qs and 10-Ks does it indicate that Defendants had a "signed agreement" or "contract win" on the NFS NexGen implementation at Kiatnakin, Thailand or GMAC China. In fact, on May 13, 2014 (six months after the Class Period), Najeeb ***admitted that the Company had no signed agreements for the NFS NexGen***:

HOWARD HALPERN: Okay. And in terms of the pipeline, if you could maybe give a little color into what percentage you are seeing in those three regions -- US, Europe, and Asia, and especially skewed to the US. Does that pipeline put you on track for the percentage of revenues that you had wanted to achieve in prior calls?

NAJEEB GHAURI: Yes, absolutely. Howard, what is interesting in the last few months, since actually we announced the launch of NFS Ascent

---

[9] *See also* NetSol's Form 10-Q for the period ended December 31, 2011: "***Won*** a ***major contract*** in the area of 'Information Security' with a leading Telecom in Pakistan. ***Under the agreement*** NetSol will provide a comprehensive solution to the client that includes an 'Intrusion Prevention System' and 'Security Information and Event Management System.'" *See* Ex. B to Possner Decl. at 74 (emphasis added).

Plaintiffs' MPA in Opposition to Defendants' Motion to
Dismiss the First Amended Consolidated Complaint

a few months ago, you're seeing much more traction in the ***North American market*** than we used to see prior to the announcement, maybe eight or ***10 different deals on the table right now*** that we are working through, different stages, different levels, and mostly NFS Ascent.

As Roger said, we were looking for a bigger growth in the US market in the coming months or coming years, but in the ***Asia-Pacific market***, it is actually even stronger, and ***we are looking at some customers*** in Thailand, in China, some in Japan, other parts of Asia-Pacific market, very robust activities.

We're also seeing good response from the ***European customers***. ***I don't have the liberty of sharing any name, because <u>we have not made any signed agreements yet. But overall across the globe, we have seen a good response from all our customers, existing, and the new prospects</u>***.

*See* Q3 2014 NetSol Technologies. Inc. Earnings Conference Call, dated May 13, 2014, at 6 (Ex. A attached to the McKenna Decl.) (emphasis added).[10]

Thus, it is irrefutable that at the time Defendants made the statement on May 10, 2011 that "***NetSol secured multiple client wins for the NFS NextGen***" that that statement was false as Najeeb later admitted that the Company still had ***no signed agreements*** as of May 13, 2014 for the NFS NexGen, over three years later.

---

[10]  The first NFS NexGen "confirmed" signed contract to generate revenue was mentioned in the Company's Form 10-Q on November 6, 2014.  *See* NetSol's Form 10-Q, dated Nov. 6, 2014 at 23.

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

## 2.     The Demand for the NFS NextGen

Defendants argue that Plaintiffs fail to plead contemporaneous facts indicating the falsity in the Company's statements regarding demand[11] for the NFS NexGen. MTD at 10:11-11:3.

It is undisputed that Defendants spoke to investors specifically about demand for the NFS NexGen (¶¶ 30, 32).  "[O]nce defendants chose to tout" purported demand for the NFS NexGen "they were bound to do so in a manner that wouldn't mislead investors." *Berson*, 527 F.3d at 987; *see also Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1091 (1991) (investors expect corporate executives have knowledge and expertise about the company's business far exceeding the normal investor); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1052 (9th Cir. 2008) (omitting material facts when "highlighting" a product's "success made a true statement (that demand was strong) also a misleading one"); *In re Computer Assocs. Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements regarding demand as well as the others concerning the supposed health of the company, are all actionable).[12]

Here, Defendants' materially false and misleading statement regarding NetSol's securing "multiple client wins" (¶ 27) (*i.e.*, executed agreements and/or

---

[11] Demand is an economic principle that describes a consumer's ***desire and willingness*** to pay a price for a specific good or service.

[12] In *Westley v. Oclaro*, Inc., 897 F. Supp. 2d 902 (N.D. Cal. 2012), the plaintiffs argued that the defendants' statements that they were "currently seeing a return of customer demand" and that "customer demand has recently increased" were false and misleading.  *Id.* at 909.  Despite the focus of these statements on current consumer demand, the defendants argued that the statements were, in fact, forward-looking because the present-fact was "being used to make predictions about the future" and thus represented a "statement or assumption" underlying a forward-looking statement. *Id.* at 918. The court rejected the defendants' argument, holding that notwithstanding the forward-looking context in which the statement was made, "[t]he fact remains that a statement about a past or current fact can demonstrably be proven false. That is what distinguished such facts from forward-looking predictions." *Id.*

sales contracts) was related to and designed to give investors a false picture of true customer "demand."   Further, on September 5, 2012, and September 12, 2013, Naeem and Najeeb, respectively, falsely represented that "NetSol continues to enjoy demand for the current NFS solution, *as well as the next generation*" (¶¶ 30, 32) (emphasis added) when they knew that not a single customer had executed a contract or agreement to purchase the NFS NexGen when they spoke to the market.  *See* Ex. A to the McKenna Decl. at 6 (Najeeb: ". . . *we have not made any signed agreements yet* [for the NFS NexGen].") (emphasis added).   Thus, Defendants successfully led the market to believe demand existed for the NFS NexGen software with customers clamoring to sign contracts when in fact they were not.

### 3.   The Company's Purported "Global Launch" for the NFS NextGen

Having no explanation in their previous Motion to Dismiss as to their shift in the October 24, 2013 press release of announcing a "global release" of the NFS NexGen (¶ 35) to the November 8, 2013 Form 10-Q announcing "a soft, regional launch with selected customers" (¶ 39), Defendants belatedly argue that the "soft regional launch" refers to the Company's marketing initiative.  *See* MTD at 12:8-13:13.

*First*, Defendants argue that the "regional launch" language in the Company's November 8, 2013 Form 10-Q relates to NetSol's marketing and sales effort to promote the NFS NexGen.  MTD at 13:9-13.  Interestingly, Defendants remove the most important words in Defendants' statement with the use of ellipses.   The paragraph (in a side-by-side comparison) reads as follows:

| Defendants' MTD | November 8, 2013 Form 10-Q |
|---|---|
| "A focus of the marketing plan centers on the Global Launch of NFS Ascent . . . | "A focus of the marketing plan centers around the Global Launch of NFS Ascent™, the next |

Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint

| Defendants' MTD | November 8, 2013 Form 10-Q |
|---|---|
| **.** NetSol has commenced a soft, regional launch with selected customers in APAC to test the readiness for the global markets. A formal launch of the global marketing plan is expected for all of our key markets of North America, Europe, and APAC." *See* MTD at 12:17-13:3. | generation of NFS that the company has been developing for nearly four years. ***Announced on October 24, 2013***, NetSol has commenced a soft, regional launch with selected customers in APAC to test the readiness for the global markets. A formal launch of the global marketing plan is expected for all of our key markets of North America, Europe and APAC." *See* Ex. C to the Possner Decl. at p. 132 (emphasis added). |

The November 8, 2013 NetSol statement that the Company announced on October 24, 2013, a "soft regional launch with selected customers" is irrefutably false as the Company's October 24, 2013 press release does not mention "a soft, regional launch." *See* Ex. E to the McKenna Decl. Thus, any suggestion that "soft regional launch" refers to the Company's marketing initiative is a post hoc fabrication and should not be countenanced by this Court.

*Second*, Defendants creative wordsmithing that there is a material difference between the words "release" and "launch" is just that -- creative wordsmithing. Webster's New Collegiate Dictionary defines "launch" as "***to release***, catapult or send off."

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

### 4.   Defendants Purported "Release" to the Global "Auto and Equipment Finance and Leasing Industry"

Defendants argue that Plaintiffs "provide[] no fact indicating there was not a release of [the NFS NexGen] for the auto and equipment finance and leasing industry." MTD at 14:7-23.  Defendants' argument misses the point.

On October 25, 2013, Defendants announced the "release" of the NFS NexGen to the "Auto and Equipment Asset and Financing and Leasing ***Industry***." *See* Ex. F to the McKenna Decl. (emphasis added).  The October 25, 2013 statement purposefully gave investors the impression that the NFS NexGen was globally released to the world-wide "Auto and Equipment Asset and Financing and Leasing Industry."[13]  It was only a few weeks later that Defendants admitted (on November 8, 2013) that there was only a soft, regional launch (in the Asia-Pacific region) with selected customers to test the readiness for the global markets.  (¶ 39).

In short, looking at all of the Defendants' statements holistically during the Class Period, these statements gave the market the impression of unrelenting customer demand to purchase, that the NetSol NexGen had been globally released with "multiple client wins" (*i.e.*, signed contracts or agreements) when in fact the NexGen had not been globally released and no contracts/sales existed when the statements were made.  Once the market learned on November 8, 2013, that it was all just carnival barking, NetSol's stock price dropped 30% from a closing price of $7.48 on November 7, 2013, to a closing price $5.23 on November 8, 2013.

---

[13] The Company identifies three global regions or segments for its products and services: (1) North America, (2) Europe, and (3) Asia-Pacific ("APAC").  *See* NetSol's Form 10-Q for the quarterly period ended December 31, 2011 at 21 (Ex. B to the Possner Decl. at 67).  Nowhere in the October 25, 2013 press release did Defendants qualify that the NFS NexGen product was released only in Asia-Pacific. Defendants stated that the NexGen was released to the "Auto and Equipment Asset and Financing and Leasing ***Industry***" (emphasis added); and by using those words they misled the investing public into believing it was worldwide.

## C.    The Facts Collectively Raise a Strong Inference of Scienter

Defendants possess the requisite scienter under §10(b) when they act either intentionally or with deliberate recklessness. *S. Ferry*, 542 F.3d at 782; *Berson*, 527 F.3d at 987. A defendant is deliberately reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (internal quotation marks and citation omitted); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard*). In fact, a plaintiff may establish scienter by alleging facts indicating that the defendants "knew, or should have known" of the falsity of their statements. *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011).

The inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing inference." *Id.* at 324, 328 (emphasis in original). The inference of scienter need not be more likely than a plausible opposing inference; in such an instance, the tie goes to the plaintiff. *Id.* at 324. Also "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citation omitted).

### 1.    Defendants Were Deliberately Reckless in Failing to Obtain And Disclose Facts That Were Readily Available

Allegations of reckless conduct rise to the required level of scienter when they "reflect[] some degree of intentional or conscious misconduct, or what we have called deliberate recklessness." *WPP Luxembourg Gamma Three Sarl v. Spot*

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

*Runner, Inc.*, 655 F.3d 1039, 1051 (9th Cir. 2011). Moreover, a defendant is considered to be deliberately reckless if they have "reasonable grounds" to question a statement, "but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Id.* (quoting *Howard*, 228 F.3d at 1064) (citation omitted). Here, the NFS NexGen software replacing the Legacy software is the main product that NetSol sells. Clearly, the founding brothers of the Company (¶¶ 17, 18), controlling shareholders (¶ 21) and persons who claim to have day-to-day responsibility (¶¶ 17, 53, 54, 55, 70), would be aware of the status of whether they had any sales of the NFS NexGen product and whether they were prepared to release the product globally or just as a "soft regional launch" in the Asia-Pacific region. In fact, Defendants certainly knew that the Company had ***no*** contracts on May 13, 2014. *See* Ex. A at 6 attached to the McKenna Decl. In addition, the Company conference calls demonstrate that Najeeb and Naeem were knowledgeable of the sale status ("client wins") and contract documentation status of every single ongoing potential sale that NetSol had. *See* Exs. B, C, D, G, H, I, J, and K to the McKenna Decl. It must also be remembered that this software solution that NetSol sells is a major purchase for any customer, takes eighteen (18) months to install, and is actually purchased so infrequently that Defendants brag about it when it happens. *See*, *e.g.*, NetSol's Form 10-Q, dated Nov. 6, 2014 at 23 ("NetSol PK signed an agreement valued at more than $16 million over a period of five years to implement NFS AscentTM."). Therefore, it is more probable than not that Najeeb as CEO and Naeem as Director of Global Sales are both intimately aware of every single client negotiation that was ongoing to make a contract to purchase NFS NexGen.

Further, as shown by the Q1 2012 NetSol Technologies, Inc. Earnings Conference Call, dated November 8, 2011, CEO Najeeb, besides being intimately involved in the day-to-day operations of the Company (¶ 17), correctly noted for analysts that the NFS NexGen was the "bread and butter" of the Company. *See* Ex.

B to the McKenna Decl. at 6.  Thus, it would be absurd to believe that CEO Najeeb was not aware of whether there were any signed contract wins for the NFS NexGen, what revenue had come in, how many had been installed at client locations and whether the product was being sold globally or just in a "soft regional launch."  In fact, CEO Najeeb did know.  For example, in a Q3 2014 NetSol Technologies, Inc. Earnings Conference Call, dated May 13, 2014, Najeeb stated: "I don't have the liberty of sharing any name, *because we have not made any signed agreements yet* [for the NFS NexGen].") (Ex. A to the McKenna Decl. at 6).[14]  (Emphasis added.) Last, there are only four executive positions in NetSol (CEO, CFO, Senior VP, and Chief Accounting Officer), and two of those executive positions were held by Najeeb and Naeem.  Thus, the more reasonable inference is that these two high level executives and controlling shareholders, who managed the day-to-day operations of this relatively small, family-created company, were aware of the alleged misrepresentations regarding their "bread-and-butter" product – NFS NexGen.

## 2.  The Core Operations Inference Supports a Strong Inference of Scienter

Courts may impute scienter to individual defendants "based on the inference that key officers have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) (citing *S. Ferry LP*, 542 F.3d at 782). The core operations inference may be sufficient to show scienter when the particular allegations "suggest that defendants had actual access to the disputed information." *Reese*, 747 F.3d at 575-76.  Here, Defendants Najeeb (CEO) and Naeem (Director and President of Global Sales) are certainly "key officers."  (¶¶ 17-18).  There is no

---

[14] In the Company's Q1 2012 NetSol Technologies, Inc. Earnings Conference Call, dated November 8, 2011, Najeeb discusses the business activities to date (*i.e.*, contracts agreements) that NetSol is presently engaged in.  *See* Ex. B to the McKenna Decl. at 2); *see also* Exs. C at 2, 4-5; D at 2-3; G at 1-3, 5-6; H at 2-3, 6, 9; I at 2-3, 5-6, 9; and J at 2-3, 14 to the McKenna Decl.

Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint

1   real dispute that the violations in this case concerned the core operation of NetSol's

2   business – the NFS NexGen – the Company's crucial next generation software

3   product which was, according to Defendants, supposed to sell alongside the NFS

4   Legacy software and increase revenues for the Company.

5       **a.**  **Individual Defendants Had Actual Access to the**

6          **Information Regarding the Sales of the NFS NexGen**

7      The Individual Defendants had "actual access" to information indicating the

8   true nature of the sales of the NFS NexGen.  *See Nursing Home Pension Fund,*

9   *Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (holding that it is

10  reasonable to infer that management's role "led them to become aware of the

11  allegedly improper revenue recognition" when the CEO stated "I love getting

12  involved in every detail of the business," and all three top executives monitored

13  portions of the company's global database).

14     In *In re Peoplesoft, Inc., Sec. Litig.*, 2000 WL 1737936 (N.D. Cal. 2000), the

15  court applied with approval the core operations doctrine.  In that case, like this case,

16  PeopleSoft was a developer and seller of software for businesses. The court found

17  that it was appropriate to charge the senior managers of the corporation, just like the

18  two defendants here, with scienter as to false statements about important problems

19  with their flagship software product.  The court found it telling that management

20  knew how long it took its software to be implemented by a customer and that they

21  would therefore "have visibility" into how those sales and implementations were

22  proceeding:

23     Senior management affirmatively touted its long-term "high visibility"

24     to see into the future and to make reliable forecasts based on the long

25     lead time needed to design and to implement ERP installations. This

26     same visibility can be presumed to have given them the ability to see

27     the downturn before it was reported.  [*Id.*, at *3].

28

The *PeopleSoft* court cited with approval *Epstein v. Itron, Inc.*, 993 F. Supp. 1314 (E.D. Wash. 1998), wherein the court held:

> As the Second Circuit has noted, the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income. *See Cosmas v. Hassett*, 886 F.2d 8, 10 (2d Cir. 1989) (attributing to directors knowledge of recently imposed import restrictions that directly affected company's prospective sales). In other words, facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. [993 F. Supp. at 1325-26].

Courts, in finding scienter in connection with the core operations doctrine, have found the following factors important: (1) the size of the company, (2) the importance to the company of the product or issue about which the false statements were made, (3) the corporate positions of the individual defendants and (4) whether they claimed to have day-to-day management responsibilities and/or responsibility over the important product or issue in question.

In *Patel v. Axesstel, Inc.*, 2015 WL 631525 (S.D. Cal. 2015), the defendant company provided wireless and broadband products. There were 35 full term employees and 8 consultants. Defendant Hickock was Axesstel's CEO and a Director, and also assumed the duties of Chief Marketing Officer. He also signed SEC statements pursuant to a Sarbanes-Oxley Certification. The other defendant was Axesstel's CFO who later became CEO when Hickock was terminated. This Defendant, Gray, also signed SEC filings. The complaint alleged that Axesstel improperly reported revenue and misrepresented the collectability of accounts receivable. Factors that the *Axesstel* court found important were:

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

1

2

3

4

> [T]he small size of Axesstel, the egregiousness of the accounting errors, the relatively large amount of the improperly recognized revenue, and the statements from both Hickock and Gray indicating direct involvement in Axesstel's sales and collections.

5   *Id.*, at *8.  The *Axesstel* court also found it important that:

6

7

8

9

10

11

12

13

> Axesstel is an exceedingly small company and these were no ordinary contracts. The total of five contracts in question accounted for twenty to forty percent of the revenue Axesstel was recognizing in the respective quarters.  Moreover, these were supposedly the first contracts for sale of the Home Alert products, and sales that Hickock touted on his calls with investors. Thus, while Hickock and Gray did not have to review every detail of these contracts, it was deliberately and consciously reckless for them to fail to at least confirm that such contracts existed.

14   *Id.*, at *9.

15   Last, the *Axesstel* court considered it important that the falsely recognized

16   revenue "came from only a handful of contracts and signified the first sales of a

17   major new product for Axesstel" concluding that this "creates a strong inference that

18   Hickock and Gray would be aware of the details of these sales."  *Id.*, at *10 (citing

19   *Berson*, 527 F.3d 982).[15]

20   Similarly, in our case, the NFS NexGen software replacing the Legacy

21   software is the main product that NetSol sells.  Clearly, the founding brothers of the

22   Company (¶¶ 17, 18), controlling shareholders (¶ 21) and persons who claim to have

23   day-to-day responsibility (¶¶ 17, 53, 54, 55, 70), would be aware of the status of

24

25

26

27

28

---

[15] *Axesstel* also cited with approval *Curry v. Hansen Medical, Inc.*, 2012 WL 3242447, at *11 (N.D. Cal. 2012) (holding that because defendant was a small company with less than 200 employees and sold so few units, each of which was significant to its revenue stream, the individual defendants must have known about each of the sales).

**Plaintiffs' MPA in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Complaint**

whether they had any signed "contract wins" of the NFS NextGen product and whether they were prepared to release the product globally or just as a "soft regional launch" in the Asia-Pacific area.

Here, the conference calls demonstrate that Najeeb and Naeem were intimately knowledgeable of the sale status ("client wins") and contract documentation status of every single ongoing project that NetSol had. *See* Ex. B at 2; Ex. C at 2, 4-5, Ex. D at 2-3, Ex. G at 1-3, 5-6; Ex. H at 2-3, 6, 9; Ex. I at 2-3, 5-6, 9; and Ex. J at 2-3, 14, to the McKenna Decl.  It must also be remembered that this software solution that NetSol sells is a major purchase for any customer, takes eighteen (18) months to install, and rarely happens.  So it is no wonder that Naeem as Director of Global Sales and Najeeb ad CEO are intimately aware of every single contract and client negotiation that is ongoing.

In addition, as shown by the Q1 2012 NetSol Technologies, Inc. Earnings Conference Call, dated November 8, 2011, at Ex. A to the McKenna Decl., CEO Najeeb, besides being intimately involved in the day-to-day operations of the Company (¶¶17, 53, 54, 55, 70), correctly noted for analysts that the NFS NexGen was the "bread and butter" of the Company.  Thus, it would be absurd to believe that CEO Najeeb was not aware of whether any NFS NexGen had been sold, what revenue had come in, how many had been installed at client locations and whether the product was being sold globally or just as a "soft regional launch" in Asia-Pacific.  For example, in a Q3 2014 NetSol Technologies, Inc. Earnings Conference Call, dated May 13, 2014, Najeeb stated that ". . . *we have not made any signed agreements yet [for the NFS NexGen]*."  (Ex. A to the McKenna Decl.).  In addition, there are only four executive positions in NetSol (CEO, CFO, Senior VP, and Chief Accounting Officer), and two of those executive positions were held by Najeeb and Naeem.  Thus, the most reasonable inference is that these two high level executives, who managed the day-to-day operations of this relatively small, family-created company, were aware of the alleged misrepresentations regarding their

Plaintiffs' MPA in Opposition to Defendants' Motion to
Dismiss the First Amended Consolidated Complaint

1   "bread-and-butter" product.  *See also Allstate Life Ins. Co. v. Robert W. Baird &*
2   *Co., Inc.*, 756 F. Supp. 2d 1113, 1133 (D. Arizona 2010) (core operations doctrine
3   applied against Defendant Fain who was one of Defendant FSG's four members that
4   managed the day-to-day operations of a small, family owned company).

5        In the *Daou* case, the individual defendants personally directed the company's
6   recognition of revenue, financial reporting, and public statements.  Thus, the core
7   operations doctrine was applied to hold that scienter had been adequately alleged.
8   411 F.3d at 1023.  Likewise, in this case, the two Defendants as CEO and Director
9   of Global Sales, have personal knowledge of each potential and actual sale of the
10  NFS Legacy product, as well as the NFS NexGen, and admittedly have been
11  involved in the "day-to-day" operations of the Company.  *See* Company Conference
12  Calls attached to McKenna Decl. as Exs. B, C, D, G, H, I, J, and K.  Clearly,
13  therefore, it is appropriate to charge these two individual Defendants with
14  knowledge that their statements were false when they claimed to have made sales of
15  the NFS NexGen product ("multiple client wins") and when they claimed that they
16  were making a global launch of the product, when in fact, they knew they were only
17  making a "soft regional launch" in the Asia-Pacific region.  *See also In re Daou Sys.,*
18  *Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("specific admissions from top executives
19  that they are involved in every detail of the company and that they monitor portions
20  of the company's database are factors in favor of inferring scienter in light of
21  improper accounting reports") (citing with approval *Nursing Home Pension Fund*,
22  380 F.3d at 1234).[16]

23  _____

24  [16] *See also America West*, 320 F.3d at 941-943 (finding it absurd to suggest directors,
25  who were officers of a controlling corporate shareholder which knew of America
    West's ongoing maintenance problems and deferred expenses, would also not know
26  of those problems.  Here, it is absurd to suggest that Najeeb and Naeem would not
27  know that their statements about the NFS NexGen signed contract wins and its
    global launch were false when made.  They certainly knew about the complete lack
28  of sales after the Class Period when Najeeb stated ". . . *we have not made any*

1

2

**D.     Defendants' Alleged Stock Positions**

**And/Or Purchases Do Not Negate Scienter**

3

4

5

6

7

8

9

10

11

12

13

14

The Individual Defendants' stock positions do not negate any inference of scienter.  MTD at 19:16-20:10.  First, the FAC does not even rely on insider trading allegations to demonstrate scienter, and this Court should not take judicial notice of Defendants' stock purchases as reflected in hearsay SEC filings.  *Maiman v. Talbott*, 2010 U.S. Dist. LEXIS 142712, at *19-20 (C.D. Cal. Aug. 9, 2010); *Am. W.*, 320 F.3d at 944; *accord State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (the lack of stock sales "do[es] not neutralize the motive allegations because they do not directly contradict them." ).  Further, this Court has already held that it "is reluctant to assign significant weight to Defendants' trading history when, for example, other family members involved in the business might have traded on Defendants' behalf."  Order at 9 (citing *America West*, 320 F.3d at 944 ("the lack of stock sales by a defendant is not dispositive as to scienter.").

15

**E.     Defendants' Statements Are Not Forward Looking**

16

17

18

19

20

21

As outlined above, Plaintiffs allege that Defendants made four statements in violation of the Exchange Act:  (1) they had recently "secured multiple client wins for NFS NextGen" (¶ 27); (2) "NetSol continues to enjoy demand for the current NFS solution, as well as the next generation" (¶¶ 30, 32); (3) announcing the "rollout of NFS [NexGen]" and the "introduction and ***global release***[17] of NFS [NexGen], the company's next generation platform . . ." (¶ 35) (emphasis added);

22

23

24

*signed agreements yet [for the NFS NexGen].*"  *See* Q3 2014 NetSol Technologies, Inc. Earnings Conference Call, attached as Ex. A to the McKenna Decl.

25

26

27

28

[17] For the reasons discussed in Section IV.B.4 (above), Plaintiffs also argue that Defendants October 25, 2013 statement regarding the "release" of the NFS NexGen to the "Auto and Equipment Asset and Financing and Leasing ***Industry***" (emphasis added) was also misleading.

1   and (4) announcing on October 25, 2013, the "release" of the NFS NexGen to the

2   "Auto and Equipment Asset and Financing and Leasing Industry." (¶ 37).[18] Each of

3   these statements is actionable under the PSLRA.

4        As this Court already held, "[f]orward looking statements include . . . 'plans

5   and objectives of management for future operations, including plans or objectives

6   relating to the products or services of the issuer[.]'   15 U.S.C. § 78u-5(i)(1). The

7   PSLRA precludes liability for a forward-looking statement if (1) it is either

8   immaterial or accompanied by 'meaningful cautionary statements identifying

9   important factors that could cause actual results to differ materially from those in the

10  forward-looking statement' or (2) the plaintiff fails to adequately plead scienter."

11  Order at 6-7.   The four actionable statements each concerned then (allegedly)

12  current, material facts regarding NetSol's business and, as outlined above, were

13  made with scienter.   Further, contrary to Defendants' argument in their previous

14  motion (Dkt. No. 49-1, 17:17-18:11), the statements were not accompanied by

15  meaningful cautionary language.   Defendants cannot inform shareholders of existing

16  contract wins and the current introduction of a new product globally when there

17  were no contracts and it was not global.

18       **F.   Plaintiffs Allege Control Person Claims Under Section 20(a)**

19       Section 20(a) of the Exchange Act makes "controlling" individuals also liable

20  for violations of §10(b) and Rule 10b-5.   *Zucco Partners, LLC v. Digimarc Corp.*,

21  552 F.3d 981, 990 (9th Cir. 2009).   The FAC alleges that the Individual Defendants

22  were "control persons" under § 20(a).   ¶¶17, 18, 21-23, 53-56.   Plaintiffs have

23  adequately alleged that Najeeb and Naeem had direct and supervisory involvement

24  in the day-to-day operations of the Company and possessed intimate knowledge of

25  _____

26  [18] Plaintiffs do not rest Defendants' liability under the Exchange Act on vague
    statements regarding its alleged status as "de facto leader" and "continue[d]
27  strengthening [of] its position[,]" MTD at 15:18-24, but rather these four false
    statements regarding the Company's current on-going business operations.
28

**Plaintiffs' MPA in Opposition to Defendants' Motion to
                                                              Dismiss the First Amended Consolidated Complaint**

the misleading financial information filed by the Company with the SEC and disseminated to the investing public.  Nothing more is needed.  Plaintiffs therefore have successfully alleged a § 20(a) violation.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.  Alternatively, if the Court grants any part of the motion, Plaintiffs respectfully request leave to amend.  *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

STULL, STULL & BRODY

Dated: May 11, 2015          By:      */s/Patrice L. Bishop*
Patrice L. Bishop
9430 West Olympic Boulevard
Suite 400
Beverly Hills, CA  90212
Tel:   (310) 209-2468
Fax:   (310) 209-2087

*Liaison Counsel for Lead Plaintiff and the Putative Class*

Thomas J. McKenna (admitted *Pro Hac Vice*)
tjmckenna@gme-law.com
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:   (212) 983-1300
Fax:   (212) 983-0383

*Lead Counsel for Lead Plaintiff and the Putative Class*